UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: 24-cr-0968-AGS |
|---|---|
| Plaintiff, | **ORDER DENYING MOTION TO SUPPRESS EVIDENCE (ECF 26)** |
| v. | |
| Pedro Francisco SALAS, | |
| Defendant. | |

In this felon-in-possession-of-a-firearm case, defendant moves to suppress the gun and other evidence found in his car during a traffic stop.

### BACKGROUND[1]

On March 19, 2024, two San Diego Police Department officers—recent police academy graduate Officer Haas and his field training officer, Officer Adams—were on a training patrol in San Diego, California. That morning, they observed a Honda Accord driven by defendant Pedro Salas that had "window tint on the front driver's side" that appeared "darker than . . . legally allowed in California." (*See* ECF 26-1, at 3; ECF 46, at 9.) The officers signaled Salas to pull over, and both vehicles came to a stop at 7:44 a.m.

Officer Haas, the trainee, approached Salas's vehicle, knocked on his window, and asked him to roll it down. Salas instead opened the door, explaining that the window "doesn't go down." Within the first minute of the stop and about 22 seconds after knocking on Salas's window, Officer Haas says he saw "a glass bulbous pipe with a burnt end . . . in the center console." (ECF 26-1, at 3.) Although this item was in fact a methamphetamine pipe, Haas mistook it for "a marijuana pipe," which he thought was "legal in California." (ECF 46, at 14, 42; *see also id.* at 39–42, 73.)

---

[1] The Court draws many of the facts here from the body-worn-camera footage and mentions them without citation. Record citations are to the paper documents.

1

Officer Haas collected Salas's license and registration. Salas also provided an expired insurance card and volunteered that he did not have valid insurance. (*See* ECF 28-1, at 6); *see also* Cal. Vehicle Code §§ 16028, 16029. The officers then spent several minutes running records checks that revealed, among other things, Salas's "felony convictions for firearms possession and narcotics sales." (ECF 28-1, at 6.)

As another police vehicle arrived on scene, Officer Adams spent about a minute and ten seconds advising Officer Haas on the best strategy to get Salas's consent to search. (*See* ECF 28, at 16.) After this huddle, Haas repositioned his patrol vehicle, and both officers returned to Salas's car. They waited a little over 20 seconds for Salas to finish a phone call, and then Officer Haas had Salas step out of the vehicle. At 7:53 a.m., Officer Haas asked, "[K]nowing that you have been arrested for dope and drugs, is there anything illegal in the car at all?" Salas replied, "I got some weed, man. That's all I got." Haas requested consent to search the car, but Salas refused. Salas explained that the marijuana was on the passenger seat in a "little bag" from a "dispensary." Officer Haas asked, "Is it sealed in its bag?" Salas said yes. Haas then queried, "Is it still in its original packaging?" Salas replied, "No, I ripped it open already. It's already open."

At about 7:56 a.m., Officer Haas began to search the car, and he quickly located the marijuana bag on the passenger seat. The bag appeared to be resealed. Haas removed it and placed it on the hood of his patrol vehicle. He then returned to Salas's car to look for "any more loose or unsealed bags of marijuana." (ECF 46, at 19–20.) At about 7:57 a.m., he located the meth pipe underneath some paperwork in the center console. As Haas was still inspecting the pipe, Officer Adams saw it and immediately said they could now search the whole car. Adams verified where Haas found the pipe and then asked, "Could you see it?" Haas replied, "I mean, it was covered by that [paperwork], but—" Officer Adams went on to say, "So, we have the meth pipe, right? Based off of that, we have the whole car." Haas said, "Right, okay. Oh!" Adams then explained that after they arrested and searched Salas, "we're going to search his car all the way." At 7:58 a.m., they handcuffed Salas and told him they were placing him under arrest for the meth pipe.

|   |   |
|---|---|
| 1 | During a more thorough search of Salas's car, Officer Adams found a loaded handgun. Salas was booked for possession of drug paraphernalia and various state firearms and drug charges. (*See* ECF 26-1, at 3–4.) At 2:39 p.m., Officer Haas filed his arrest report, which documented in relevant part that: (1) after Salas opened his car door, Haas noticed in the center console "a glass bulbous pipe with a burnt end that [he] recognized to be used for smoking drugs"; (2) after Haas recovered "the bag of marijuana," he "remembered the glass pipe that [he] saw initially"; and (3) he ultimately "retrieved the pipe from the center console," which was underneath some paperwork that "Salas had placed" there. (*See id.*) Salas is now charged with being a felon in possession of a firearm. *See* 18 U.S.C. § 922(g)(1). |

## DISCUSSION

Salas challenges the constitutionality of the traffic stop, the vehicle search, and the duration of his detention. "Because warrantless searches and seizures are *per se* unreasonable, the government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement." *Recchia v. City of L.A. Dep't of Animal Servs.*, 889 F.3d 553, 558 (9th Cir. 2018).

### A.  Traffic Stop

First, Salas contends that the police violated his constitutional rights by pulling him over for driving with illegally tinted windows. "[T]he Fourth Amendment permits an officer to initiate a brief investigative traffic stop" based on reasonable suspicion—that is, "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Kansas v. Glover*, 589 U.S. 376, 380 (2020). The reasonable-suspicion standard "is not a particularly high threshold to reach." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc). It is more than a "mere 'hunch,'" but it requires "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Glover*, 589 U.S. at 380.

So, did these officers reasonably suspect the tinted windows violated state law? As the defense points out, not all tinting is illegal. *See* Cal. Vehicle Code § 26708. Motorists

may have tinted "front side windows" if, among other things, the shaded "material has a minimum visible light transmittance of 88 percent." *See* Cal. Vehicle Code § 26708(d).

Due to such statutory nuances, an officer cannot "justify a traffic stop" with the bare-bones conclusion that a car's "windows were tinted." *United States v. Caseres*, 533 F.3d 1064, 1069 (9th Cir. 2008); *see id.* at 1067, 1069, 1069 n.2 (commenting that police had no reasonable suspicion for a stop premised solely on the nighttime observation that the "front passenger compartment windows appeared to be tinted" and confirming in a footnote that the shaded "front windows were not, in fact, illegally tinted"); *see also People v. Butler*, 248 Cal. Rptr. 887, 889–90 (Ct. App. 1988) (holding that officer lacked reasonable suspicion for "an investigative stop" based on his general observation—"from a distance late at night"—that "the car had tinted windows").

But clearing the low bar of reasonable suspicion requires little more. Police need not "carry around and use burdensome equipment to measure light transmittance." *United States v. Wallace*, 213 F.3d 1216, 1220 (9th Cir. 2000) (quoting *People v. Niebauer*, 263 Cal. Rptr. 287, 295 (Ct. App. 1989)). The record must simply demonstrate a particularized and objective basis for believing that the degree of window tinting violates the law. In *United States v. Pullen*, No. 23-10036, 2024 WL 2843036 (9th Cir. June 5, 2024), for instance, the Ninth Circuit held that officers "reasonably suspected illegal window tinting, because the windows were tinted to some degree" and "appear[ed] to be overly tinted in at least some images" introduced in court. *Id.* at *2; *see also Wallace*, 213 F.3d at 1220 (ruling that the higher standard of probable cause was met based on officer's testimony that the car's glass had "heavy tint" and that, "even during the daylight hours," it was "harder" to see into the vehicle); *Niebauer*, 263 Cal. Rptr. at 288, 295 (holding that a *conviction* for "driving with dark tinting material," in violation of Cal. Vehicle Code § 26708(a), may be based solely on an officer's honest opinion, from "a common-sense examination of a vehicle," that "light is obstructed in the fashion contemplated by the statute").

The government has carried its burden of showing the officers had reasonable suspicion that the *degree* of window tinting was unlawful. During daylight hours, the police noted that the front side windows on Salas's car were "darker than . . . legally allowed in California." (ECF 46, at 8–9; *see also* ECF 28-1, at 6 ("window . . . was obscured with dark tint").) Photographs and body-worn-camera footage corroborate that assessment: the material covering the car's side windows looks not just tinted, but fairly dark. Even Salas himself seemed to suspect that the film on his window was too shaded. When Officer Haas explained that he stopped Salas "because of your window tint," Salas spontaneously replied, "I knew it. I can pull it out, though."

The vehicle stop was proper. *See Pullen*, 2024 WL 2843036, at *2.

**B.  Car Search**

Even if the traffic stop passed constitutional muster, Salas insists the vehicle search did not. The government argues that the police had probable cause to search the car based on the illegal meth pipe in plain view. Two Fourth Amendment warrant-requirement exceptions are relevant here. First, under the "automobile exception," police may search a car without a warrant "if there is probable cause to believe that [it] contains evidence of a crime." *United States v. Faagai*, 869 F.3d 1145, 1150 (9th Cir. 2017). Second, officers may conduct a warrantless "vehicle search incident to a recent occupant's arrest" when "it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 335 (2009). This incident-to-arrest exception even covers car searches that *precede* the actual arrest. "So long as an arrest that follows a search is supported by probable cause independent of the fruits of the search, the precise timing of the search is not critical." *United States v. Smith*, 389 F.3d 944, 951 (9th Cir. 2004) (per curiam).

Under the Fourth Amendment, probable cause exists when, "under the totality of the circumstances, a prudent officer would have believed that there was a fair probability" that a suspect "committed a crime," *United States v. Collins*, 427 F.3d 688, 691 (9th Cir. 2005), or that "contraband or evidence of a crime will be found in a particular place," *Illinois v.*

5

*Gates*, 462 U.S. 213, 214 (1983). When "officers were acting in concert," courts consider "the collective knowledge of all the officers involved in the criminal investigation." *United States v. Fowlkes*, 804 F.3d 954, 971 (9th Cir. 2015).

Probable cause is an objective standard. That is, courts look only to the "objective reasonableness" of the officers' actions, not to their "subjective motivations." *United States v. Taylor*, 60 F.4th 1233, 1240 (9th Cir. 2023). "[A]n officer's subjective thoughts play no role in the Fourth Amendment analysis." *United States v. Ramirez*, 473 F.3d 1026, 1030 (9th Cir. 2007) (citing *Whren v. United States*, 517 U.S. 806, 811–13 (1996)).

According to Officer Haas, at the outset of this encounter, he "noticed a glass bulbous pipe with a burnt end"—later determined to be an illegal meth pipe—in the car's "center console." (*See* ECF 26-1, at 3; *see also* ECF 46, at 12–14, 20, 40); Cal. Health & Safety Code § 11364(a). Yet he did not immediately collect it or arrest Salas, because he mistakenly "believed it was a marijuana pipe." (ECF 46, at 14; *see also id.* at 39–42, 73.) Thinking "it's legal in California," Officer Haas "wasn't exactly sure how to proceed, as [he] was still in training." (ECF 46, at 14, 42; *see also id.* at 73.) During the later car search, Haas found the pipe still in the center console, but hidden underneath some paperwork that he assumed "Salas had set . . . on top of it." (ECF 28-1, at 4.) The defense protests that: (1) this testimony cannot be believed, and (2) even if true, Officer Haas didn't think the item was contraband, so he didn't have probable cause.

As to the latter argument, it is of no moment that Officer Haas mistakenly assumed the pipe was for marijuana. The issue is not whether trainee Haas *in fact* believed the object was illegal drug paraphernalia. It is whether "a prudent officer" would have believed so to a "fair probability." *See Collins*, 427 F.3d at 691. This standard "is not terribly demanding" and is easily met here. *See id.* The objective facts and photographic evidence all suggest that the item in Salas's center console was likely a meth pipe. When the more experienced Officer Adams first saw it, after all, he "understood right away that that pipe was contraband . . . . [N]o doubt about it[.]" (ECF 46, at 102; *see id.* at 89–91, 103.)

The more troubling accusation is that Officer Haas's testimony is a false, post hoc search justification. The defense charges that, despite his sworn statements, "Officer Haas did not see the methamphetamine pipe in plain view when Mr. Salas opened his car door" and instead discovered it only when his "search of Mr. Salas's car began." (ECF 31, at 3.) Salas highlights both video and circumstantial evidence to undermine Haas's account.

First, Salas claims that "incontrovertible video evidence . . . discredits [Officer Haas's] version of events entirely," as Haas's "body-worn camera footage" makes clear that the meth pipe wasn't "in plain view when Mr. Salas opened his car door." (ECF 31, at 3, 6.) The Court respectfully disagrees. While the video doesn't show the glass pipe until it is seized, the body-worn camera captured only partial glimpses of the center console, where the pipe was found. And Haas testified that his eyes had "a better angle or vantage point" than the camera lens affixed to his chest. (*See* ECF 46, at 12–13.) The Court spent hours scrutinizing the video as well as enlarged still images of the relevant area inside the car. (*See* ECF 61-1; ECF 64-1.) At the start of the traffic stop, the camera's view of the center console is obstructed and indistinct. The footage neither confirms nor contradicts Haas's testimony that he spotted a meth pipe that was visible at eye level, but not at the chest-level angle of his camera. Nor does it clarify whether the paperwork—under which the pipe was found—remained in the same position throughout the encounter. Thus, the visual evidence is inconclusive.

Nonetheless, Salas also questions the officer's story based on these circumstances:

- Officer Haas was "trained to identify contraband, seize contraband," and take steps "to avoid the destruction or concealment of evidence." (ECF 31, at 5.) He thus would have recognized "a methamphetamine pipe with residue on it" and immediately reported it. (*Id.*) Alternatively, he would have promptly told his partner about *any* drug paraphernalia, "whether it's meth or marijuana." (ECF 46, at 140.) He did not.
- Officer Haas repeatedly passed up chances to notify his supervising officer about seeing the glass pipe. He said nothing "at the very outset of the interaction," nor

when he "debrief[ed] with Officer Adams," nor as he ran "a records check" on Salas, nor when the officers were strategizing how to get "consent to a search." (ECF 31, at 2, 5.) If Officer Haas saw the pipe from the start, it is implausible that he would wait until returning to the station to first mention it to his partner.

- When Officer Haas searched the car, he didn't check the center console straight away, as one might expect if he had seen the pipe there.

- Between the start of the traffic stop—when the pipe was supposedly in plain view—and its later discovery under some papers, Officer Haas surmised that "Salas had set paperwork on top of it." (ECF 28-1, at 4.) Yet Salas swears, "I did not move any pieces of paper to try to conceal the pipe that was in my car." (ECF 31-1, at 2.) And if Salas were inclined to hide the pipe, he likely would have done so before giving the police "an opportunity to see [it] in plain view." (ECF 31, at 5.)

- After Officer Haas recovered the meth pipe, Officer Adams asked, "Could you see it?" Haas didn't mention seeing it at the beginning of the stop, replying only, "I mean, it was covered by that [paperwork], but—"

Despite these well-articulated concerns, the Court finds that Officer Haas did in fact see the pipe in plain view at the outset of the traffic stop. He then mistakenly dismissed it as a legal marijuana accessory and quickly put it out of mind, as he focused on the still-unfamiliar nuts and bolts of traffic-stop protocol.

Several factors persuade the Court. First, it is believable that a trainee would mistake a meth pipe for a marijuana pipe. Officer Haas was a few months out of the police academy and still in his final phase of field training. (ECF 46, at 5–6, 23–24, 38, 79–80.) Under a trainer's supervision, he had previously conducted only about "20 traffic stops and been involved in approximately four arrests." (ECF 28-1, at 3; *see also* ECF 46, at 38.) According to the testimony, the police academy introduces cadets to meth pipes "briefly," but paraphernalia "doesn't present itself in the same way necessarily" on the job. (ECF 46, at 90.) Most of the field training officer's own experience with meth pipes, for example,

8

"was in the field." (*Id.* at 89.) If Haas were a seasoned officer, the defense's concerns might well raise red flags. But he was not.

Second, after retrieving the glass pipe from the center console, Officer Haas's reaction is consistent with someone who doesn't realize its legal significance. He didn't call out to his partner that he'd found contraband, for example. Rather, he inspected it for several seconds. As Haas was still turning the pipe around in his hands, Officer Adams saw it and exclaimed that they could now search the whole car. Haas replied, "Right, okay. Oh!" Also, Officer Adams was the first person to call it a "meth pipe."

A third point that rings true is that Officer-in-Training Haas was primarily "focused on . . . completing the traffic stop as we normally do," especially since he thought the pipe was "legal in California." (ECF 46, at 16, 42; *see also id.* at 21, 73.) There are "lots of steps to a traffic stop," and his training officer wanted to ensure that Haas could read "the license plate [in]to the radio," "talk to the driver," and complete similar routine tasks. (*Id.* at 87–88.) This was also the first morning that Adams had supervised Haas. (ECF 46, at 24–25, 33, 81, 87.) This background helps explain why the glass pipe, which Haas thought was legal anyway, slipped his mind.

Fourth, the very existence of second-by-second video evidence tends to undercut suspicions of a false report. As Haas knew, both officers had body-worn cameras, which recorded different angles and views of the traffic stop. (*See* ECF 28-1, at 7; ECF 46, at 7–8.) Later that day, Officer Haas filed an arrest report, noting that he saw "a glass bulbous pipe . . . in the center console" immediately "upon Salas opening the door." (ECF 26-1, at 3.) Before writing that report, it's unlikely that Haas had hours to exhaustively review both camera feeds—nor to enlarge multiple still images of the center console—to ensure that he could safely lie about the glass pipe and not get caught. (*See* ECF 26-1, at 3.) In such circumstances, even unscrupulous officials would hesitate to falsify their write-ups.

Fifth, the Court doubts that anyone would bother concocting such a cover story. These officers assumed they didn't need to. Rightly or wrongly, both thought the car search was already justified due to an open package of cannabis. (*See* ECF 28-1, at 4, 6; ECF 46,

at 17–18, 103–04); *see also* Cal. Health & Safety Code § 11362.3(a)(4). At the time, supervising officer Adams assured trainee Haas that the open package warranted a "probable cause-based search." And there's no reason to think they ever wavered in that belief. The prosecution even pressed that search rationale during these proceedings. (*See* ECF 28, at 11–14.)

Moreover, a corrupt cop would likely deem such a fabrication to be ineffective or, worse yet, counterproductive. Suppose that an unprincipled policeman decided to lie to shore up a search he already thinks lawful. Why would he claim to have seen a pipe he deemed *legal*? Many would assume that *undercuts* probable cause, not bolsters it. Even lawyers routinely presume this. In these very proceedings, the defense asserted that Officer Haas "didn't have probable cause" because he "thought it was a marijuana pipe." (ECF 46, at 139–40.) If that legal stance were right, then our hypothetical crooked cop would have nothing to gain by conjuring up seemingly legal marijuana accessories.

An alternative theory of deception—that the officer assumed his legal-pipe testimony *strengthened* probable cause—is also dubious. Consider the necessary logical leaps. First, he would have to understand that his opinion about the pipe's lawfulness was irrelevant, as his "subjective thoughts play no role in the Fourth Amendment analysis." *See Ramirez*, 473 F.3d at 1030. That means this rookie beat cop either learned this esoteric legal principle on his own—and grasped it better than some lawyers—or perhaps he was unethically coached by a legal specialist, such as a prosecutor or city attorney. (To be clear, there is no such evidence.) Second, he would then have to expertly manipulate this judicial doctrine. His actions and testimony must thread the needle of establishing objective probable cause, while accounting for his initial indifference to the contraband. Finally, despite swearing the pipe looked legal, he would have to correctly surmise that this Court would disregard such an opinion and rule that a "prudent officer" would have thought otherwise. And if all that weren't enough, in the defense's telling, he must have hatched this plan in the instant he first saw the pipe while plucking it from the center console. Recall that the defense argues Haas would have known an illegal meth pipe on sight and

"immediately point[ed] it out" to his partner. (*See* ECF 31, at 5.) Rather than doing so here, Haas must have decided without hesitation to pretend like he didn't recognize it as contraband, performatively twisting it around in his hands for the camera. In short, this scheme demands an exceedingly rare blend of legal sophistication and Machiavellian cunning. On this record, that scenario is farfetched.

Last but not least, the Court carefully observed Officer Haas testify and is satisfied that he told the truth. In addition to his courtroom demeanor, there is no evidence of any past dishonesty in his brief career in law enforcement nor in his years of past and ongoing military service. (*See* ECF 28-1, at 3; ECF 46, at 5.)

Accordingly, this Court credits Officer Haas's testimony. Under the automobile exception and as a search incident to arrest, the officers had probable cause to search the vehicle. *See, e.g.*, *United States v. Evans*, 445 F. App'x 29, 31 (9th Cir. 2011) ("Once the officer found the pipe, noticed it had burn marks, and arrested [defendant] for possession of drug paraphernalia, the officer could lawfully search the car, including the passenger compartment, for additional contraband."). Thus, the Court need not address the parties' arguments about whether a federal marijuana-possession misdemeanor or a state open-package violation supplied additional grounds to search.

## C.   Duration of Stop

Finally, the defense maintains that the police unduly prolonged the traffic stop. A stop may last "no longer than is necessary" to "address the traffic violation," make "ordinary inquiries incident" to the stop, and "complete the traffic 'mission' safely." *Taylor*, 60 F.4th at 1239 (quoting *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015)). If officers develop "reasonable suspicion of an independent offense," the stop "may be extended to conduct an investigation" into that new crime. *Id.*

A mere 22 seconds into their roadside talk, Officer Haas objectively developed probable cause to believe that Salas possessed a meth pipe. The defense claims that later the police needlessly prolonged the detention, turning it into an arrest. Even if true, the police had probable cause for that arrest. "If an officer has probable cause to believe that

an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). Officer Haas's delay in taking Salas into custody—because Haas mistakenly thought the pipe was legal—does not convert an objectively reasonable arrest into an unreasonable one. *See United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1227 (10th Cir. 2008) ("We need not determine whether [defendant]'s investigative detention amounted to an arrest if probable cause existed, because in such circumstances, an arrest would not violate the Fourth Amendment."). The officers ultimately arrested Salas for possessing drug paraphernalia. (*See* ECF 26-1, at 3–4.) Salas can hardly complain that he remained out of custody longer than he would have if the more experienced Officer Adams, rather than his trainee, had seen the meth pipe first. The officers did not unconstitutionally extend the stop.

## CONCLUSION

Salas's motion to suppress evidence is **DENIED**.

Dated:  February 13, 2025

_____
Andrew G. Schopler
United States District Judge